WHITE & CASE LLP
Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Thomas E Lauria (admitted *pro hac vice*)
Erin R. Rosenberg (admitted *pro hac vice*)

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Harrison Denman
John Ramirez

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606-5055
Telephone: (312) 881-5400
Jason N. Zakia (admitted *pro hac vice*)

*Counsel for Capital Finance Opportunities 1701C, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Trident Holding Company, LLC, *et al.*,[1] | ) | Case No. 19-10384 (SHL) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of their respective tax identification numbers, are as follows: Trident Holding Company, LLC (6396); American Diagnostics Services, Inc. (2771); Community Mobile Diagnostics, LLC (9341); Community Mobile Ultrasound, LLC (3818); Diagnostic Labs Holdings, LLC (8024); FC Pioneer Holding Company, LLC (6683); JLMD Manager, LLC (8470); Kan-Di-Ki LLC (6100); Main Street Clinical Laboratory, Inc. (0907); MDX-MDL Holdings, LLC (2605); MetroStat Clinical Laboratory – Austin, Inc. (4366); MX Holdings, LLC (8869); MX USA, LLC (4885); New Trident Holdcorp, Inc. (4913); Rely Radiology Holdings, LLC (3284); Schryver Medical Sales and Marketing, LLC (9620); Symphony Diagnostic Services No. 1, LLC (8980); Trident Clinical Services Holdings, Inc. (6262); Trident Clinical Services Holdings, LLC (1255); TridentUSA Foot Care Services LLC (3787); TridentUSA Mobile Clinical Services, LLC (0334); TridentUSA Mobile Infusion Services, LLC (5173); U.S. Lab & Radiology, Inc. (4988). The address of the Debtors' corporate headquarters is 930 Ridgebrook Road, 3rd Floor, Sparks, MD 21152.

Capital Finance Opportunities 1701C, LLC,                )
                                                          )
                                                          )
                        Plaintiff,                        )    Adversary No. _____ (SHL)
                                                          )
            vs.                                           )
                                                          )
Trident Holding Company, LLC, New Trident Holdcorp,       )
Inc., Schryver Medical Sales and Marketing, LLC, Trident  )
Clinical Services Holdings, Inc., MX USA, LLC, Kan-Di-     )
Ki, LLC, Trident Clinical Services Holdings, LLC, MX       )
Holdings, LLC, Diagnostic Labs Holdings, LLC, Rely         )
Radiology Holdings, LLC, Symphony Diagnostic Services      )
No. 1, LLC, American Diagnostics Services, Inc., U.S. Lab  )
& Radiology, Inc., JLMD Manager, LLC, MDX-MDL              )
Holdings, LLC, Community Mobile Diagnostics, LLC,          )
Community Mobile Ultrasound, LLC, TridentUSA Mobile        )
Clinical Services, LLC, TridentUSA Mobile Infusion         )
Services, LLC, Main Street Clinical Laboratory, Inc.,      )
TridentUSA Foot Care Services, LLC, Metrostat Clinical     )
Laboratory – Austin, Inc., FC Pioneer Holding Company,     )
LLC, SPCP Group, LLC, Silver Point Finance, LLC,           )
David Smith, Mark Parrish, Steven Fishman, Adam            )
Abramson, Craig Kahler, Simon Bachleda, Alexander          )
Greene, and Nikhil Chaudhri,                               )
                                                          )
                        Defendants.                       )
                                                          )

## ADVERSARY COMPLAINT

Capital Finance Opportunities 1701C, LLC ("Capital Finance" or "Plaintiff"), as a lender ("Existing First Lien Lender") under that first lien credit agreement dated as of July 31, 2013 (as amended, amended and restated, modified or supplemented from time to time, the "Existing First Lien Credit Agreement"), by and through its undersigned counsel, hereby files this adversary complaint in connection with the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases") against Trident Holding Company, LLC (together with its affiliate subsidiaries, "Trident" or the "Company"), New Trident Holdcorp, Inc., Schryver Medical Sales and Marketing, LLC, Trident Clinical Services Holdings, Inc., FC Pioneer Holding Company,

LLC ("Holdings"), MX USA, LLC, Kan-Di-Ki, LLC, Trident Clinical Services Holdings, LLC, MX Holdings, LLC, Diagnostic Labs Holdings, LLC, Rely Radiology Holdings, LLC, Symphony Diagnostic Services No. 1, LLC, American Diagnostic Services, Inc., U.S. Lab & Radiology, Inc., JLMD Manager, LLC, MDX-MDL Holdings, LLC, Community Mobile Diagnostics, LLC, Community Mobile Ultrasound, LLC, TridentUSA Mobile Clinical Services, LLC, TridentUSA Mobile Infusion Services, LLC, Main Street Clinical Laboratory, Inc., TridentUSA Foot Care Services, LLC, Metrostat Clinical Laboratory – Austin, Inc. (collectively, the "Debtor Defendants"), SPCP Group, LLC, Silver Point Finance, LLC (collectively, "Silver Point" or the "Silver Point Defendants"), David Smith, Mark Parrish, Steven Fishman, Adam Abramson, Craig Kahler, Simon Bachleda, Alexander Greene and Nikhil Chaudhri (collectively, the "D&O Defendants" and, together with the Debtor Defendants and the Silver Point Defendants, the "Defendants") and, based upon knowledge, information, belief, and the results of its investigation to date, allege as follows:

## I.    NATURE OF ACTION

1.    At the core of these Chapter 11 Cases is the refinancing transaction consummated over three days in April 2018 (the "April 2018 Transaction"). That transaction layered all Existing First Lien Lenders, including Plaintiff, behind a new purportedly priority credit facility representing a combination of new money funds advanced by, and a roll-up of debt under the Existing First Lien Credit Agreement (the "Existing First Lien Debt") owned by, the Silver Point Defendants. Less than ten months later, the Company commenced these Chapter 11 Cases and agreed to a restructuring support agreement (now reflected in a proposed plan of reorganization) contemplating that Plaintiff and other Existing First Lien Lenders are entirely undersecured and awarding the Silver Point Defendants substantially all value in the company.

3

2.     It is unusual that a company would fail almost immediately following consummation of a liability management transaction.  That fact alone warrants further inquiry into the April 2018 Transaction's formulation and execution.  But the need for scrutiny is particularly acute given the transaction itself was highly coercive and consummated over only a three-day consent window, and where the only information provided by the Company to lenders (other than Silver Point) in connection with the solicitation consisted of a single phone call without the opportunity for questions, a summary presentation, and a set of March 2018 budget projections (the "March Budget").

3.     As such, in the Chapter 11 Cases, the Agent under the Existing First Lien Credit Agreement (the "Existing First Lien Agent") sought and obtained discovery under Rule 2004 concerning the April 2018 Transaction.  In connection with that analysis, to date the Existing First Lien Agent has reviewed 157,190 pages of documents from the Debtors and 9,933 pages of documents from Silver Point.  Last week, the Existing First Lien Agent received the first production of 5,797 pages of documents from the Debtors' equity sponsors (the "Sponsors").[2]

4.     Throughout that investigation, the Defendants have consistently defended the integrity of the April 2018 Transaction on two bases:  First, that all Existing First Lien Lenders consented to the transaction, and second, that the operational difficulties that ultimately resulted in the Company's rapid deterioration were unknown at the time of the April 2018 Transaction.

5.     Documents produced during discovery undermine both explanations.  In fact, the consents of Plaintiff and other Existing First Lien Lenders were obtained through fraud and the beginning of the Company's operational decline was, at the time of the April 2018 Transaction, already known to each of the Debtor Defendants, Silver Point Defendants and D&O Defendants,

---

[2] Each of the Sponsors has a seat on the Board of Managers of Holdings (the "Board").

but affirmatively and intentionally concealed from Plaintiff and other Existing First Lien Lenders.

6.    Specifically, the Debtor Defendants purportedly set out to consummate their refinancing transaction before investors became aware of the Company's operational results from the first quarter of 2018.  But, as the negotiation of that transaction stretched into April, the Company's records (the "March Actuals") indicated that its performance in March had fallen materially short of budget projections.  Upon the closing of the Company's March books, the Debtor Defendants promptly provided the March Actuals to the Silver Point Defendants and the Sponsors, including the D&O Defendants, accompanied by a detailed explanation for the shortfall.

7.    At the same time, however, the Debtor Defendants hid the March Actuals from Plaintiff and other Existing First Lien Lenders.  After the Company's treasury office provided the March Actuals to one Existing First Lien Lender, Ares Capital Corporation ("Ares"), in its capacity as the administrative agent (the "Second Lien Agent") under the secured second lien credit agreement dated as of July 31, 2013 (as amended, amended and restated, modified or supplemented from time to time, the "Second Lien Credit Agreement"), the Company's Chief Financial Officer, David Smith, and its advisors immediately intervened and requested that Ares ignore the March Actuals and refrain from sharing the information with other lenders. When Citibank, N.A., the agent under the Existing First Lien Credit Agreement at the time ("Citibank" or the "Former First Lien Agent"), pointed out that the Existing First Lien Credit Agreement required the Company to provide the Former First Lien Agent with the same financial information the Company had already provided to the Second Lien Agent, the Company ignored that request and provided Former First Lien Agent with the March Budget instead.  As a result,

at the time that Plaintiff and other Existing First Lien Lenders tendered their consents to the April 2018 Transaction, they did so in reliance on the March Budget and unaware of the March Actuals. Ultimately, the Debtor Defendants did not disclose the shortfall in the March Actuals to Plaintiff and other Existing First Lien Lenders until restructuring discussions began in December 2018, because the financial data for the first quarter of 2018 that the Debtor Defendants provided in May did not contain month-by-month figures and Plaintiff and other Existing First Lien Lenders would not have been able to discover the month-by-month information through the exercise of reasonable care.

8.      By this action, as described more fully below, Plaintiff asserts the following claims for relief—(i) fraudulent inducement and damages against the Debtor Defendants, the Silver Point Defendants and the D&O Defendants, (ii) aiding and abetting fraud against the Silver Point Defendants and the D&O Defendants, (iii) declaratory judgment setting aside the Intercreditor Agreement,[3] (iv) equitable subordination of the Silver Point Defendants' claims to those of Plaintiff, (v) avoidance of the April 2018 Transaction as an actual fraudulent transfer and (vi) breach of fiduciary duties against the D&O Defendants.

## II.      JURISDICTION

9.      This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re:  Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012)

---

[3] The "Intercreditor Agreement" refers to the Priority/First Lien/Second Lien Intercreditor Agreement dated as of April 30, 2018 among certain of the Debtors as Borrowers, Silver Point Finance, LLC as Priority First Lien Credit Agreement Administrative Agent, Cortland Capital Market Services LLC as Existing First Lien Credit Agreement Administrative Agent, and Ares Capital Corporation as Second Lien Credit Agreement Administrative Agent.

(Preska, C.J.).  Plaintiff consents to entry of final orders or judgments by the Court with respect to any non-core claims.

11.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409 because the Chapter 11 Cases are pending before the Court.

### III.     PROCEDURAL HISTORY

12.     On February 10, 2019 (the "Petition Date"), the Debtors filed petitions for relief (the "Chapter 11 Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (this "Court").  The Chapter 11 Cases are being jointly administered pursuant to Fed. R. Bankr. P. 1015(b).  *Order (I) Directing Joint Administration of Cases and (II) Waiving Requirements of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1005 and 2002(n)* [ECF No. 36].  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, neither a trustee nor an examiner has been appointed in these Chapter 11 Cases.

13.     On March 8, 2019, the Court entered the *Final Order (I) Authorizing Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507(b)* [ECF No. 166] (the "Final DIP Order").  In the Final DIP Order, the Debtors stipulated to the validity, extent and priority of Silver Point's liens and claims and released Silver Point of all estate causes of action.  Final DIP Order ¶ 5.  The order provided that any party in interest would have until 75 calendar days after the entry of the Final DIP Order to challenge those stipulations and to seek

standing to bring any such estate cause of action against Silver Point (the "Challenge Period"). Final DIP Order ¶ 18(a).  The Challenge Period is set to expire on May 22, 2019.  *Id.*

## IV.    **PARTIES**

14.    Plaintiff Capital Finance Opportunities 1701C, LLC is a lender under the Existing First Lien Credit Agreement and creditor in the Chapter 11 Cases.

15.    The Debtor Defendants are all Debtors in the Chapter 11 Cases and all Debtor Defendants besides Holdings are parties to the Intercreditor Agreement.

16.    Defendant Silver Point Finance, LLC is the administrative agent under the Priority First Lien Credit Agreement (defined below), the administrative agent under the DIP facility, and a party to the Intercreditor Agreement.

17.    Defendant SPCP Group, LLC is a lender under the Priority First Lien Credit Agreement.

18.    Upon information and belief, Defendant David Smith was the CFO of Holdings at or around the time of the April 2018 Transaction.

19.    Upon information and belief, Defendant Mark Parrish was the CEO and a Manager of Holdings at or around the time of the April 2018 Transaction.

20.    Upon information and belief, Defendant Steven Fishman was a Manager of Holdings at or around the time of the April 2018 Transaction.

21.    Upon information and belief, Defendant Adam Abramson was a Manager of Holdings at or around the time of the April 2018 Transaction.

22.    Upon information and belief, Defendant Craig Kahler was a Manager of Holdings at or around the time of the April 2018 Transaction.

23.    Upon information and belief, Defendant Simon Bachleda was a Manager of Holdings at or around the time of the April 2018 Transaction.

24.     Upon information and belief, Defendant Alexander Greene was a Manager of Holdings at or around the time of the April 2018 Transaction.

25.     Upon information and belief, Defendant Nikhil Chaudhri was a Manager of Holdings at or around the time of the April 2018 Transaction.

## V.     FACTUAL BACKGROUND

### A.     Debtor Defendants' December Strategy

26.     In December of 2017, the Debtor Defendants' advisors, PJT Partners Inc. ("PJT"), presented a refinancing game plan to the Debtor Defendants (the "December Strategy"). The purpose of the December Strategy was to formulate a path to remedy the Company's impending financial covenant default that would be triggered in Q1 2018 and address the upcoming maturity of the revolving debt. At the time of PJT's presentation, the Company's capital structure consisted of, among other things, $70 million of revolving debt (the "RCF"), $319.3 million of Existing First Lien Debt, and $159.3 million of second lien debt. The proposal included a first-out, second-out, and third-out structure within the Existing First Lien Debt and payoff of the RCF. The refinancing transaction would force lenders to consent or be moved to the back of the line with respect to lien and payment priority.

27.     PJT's presentation to the Board was explicit regarding the optimal timetable for the December Strategy: Such transaction should be consummated before the Debtor Defendants would have to disclose their Q1 2018 financials.

28.     From December 2017 through April 2018, various Existing First Lien Lenders, including Plaintiff, made inbound requests of the Debtor Defendants and their advisors, including inquiries into the Debtor Defendants' strategy for addressing the maturity of the RCF, the Debtor Defendants' increasing leverage ratios, the Debtor Defendants' continuing need for additional liquidity, and the Debtor Defendants' ability to comply with their debt documents.

9

Neither the Debtor Defendants nor their advisors meaningfully engaged with Plaintiff or other Existing First Lien Lenders on these inquiries.

29.     At the same time, after an initial period of discussions with various third party investors, the Debtor Defendants and their advisors began to focus exclusively on negotiations with the Silver Point Defendants.  On March 23, 2018, the Debtor Defendants and the Silver Point Defendants signed an exclusivity agreement which obligated the Debtor Defendants to negotiate with the Silver Point Defendants on an exclusive basis until April 30, 2018 (the last day by which the Company believed it needed to close the April 2018 Transaction).  Despite multiple inquiries from Existing First Lien Lenders, including Plaintiff, the Debtor Defendants never disclosed the fact of their exclusive arrangement with the Silver Point Defendants or their ongoing discussions with the Silver Point Defendants.

30.     On April 2, 2018, with no deal yet in place, the Debtor Defendants were forced to send a "Borrower Default Notice" stating their failure to deliver (i) consolidated financial statements for the fiscal year ending 2017, and (ii) a reasonably detailed consolidated budget for the fiscal year ending December 31, 2018.  The Borrower Default Notice also indicated the Debtor Defendants' intent to cure those defaults within thirty days in accordance with certain provisions of the Existing First Lien Credit Agreement.  The clock on execution of the December Strategy was now down to thirty days, with no transaction in place.

31.     Shortly thereafter, the Debtor Defendants and the Silver Point Defendants reached agreement on the terms of what became the April 2018 Transaction.  That agreement contemplated the infusion of an additional $160 million in capital into the Company.  In return, the Existing First Lien Credit Agreement and the existing intercreditor agreement between

lenders would be modified to subordinate all non-Silver Point lenders, including Plaintiff and all

other Existing First Lien Lenders, to the Silver Point Defendants.

32.     Critically, the agreement with Silver Point hinged on obtaining as much consent

from the Existing First Lien Lenders as possible.  As a legal matter, consent from Existing First

Lien Lenders holding more than 50% of the Existing First Lien Debt was necessary for the

Company to amend the existing documents in the manner required by its agreement with Silver

Point.  As such, the agreement provided that, upon passing that threshold, Silver Point (who at

the time owned roughly $56 million, or approximately 17% of the Existing First Lien Debt),

would form a new class of first lien debt—called the "First Out Term Loan"—which would

include Silver Point's new money investment plus a "roll up" of its existing $56 million of

Existing First Lien Debt.

33.     Those Existing First Lien Lenders that consented to the proposal would become

the "Second Out Term Loan," and would share, pro rata, in a $50 million paydown of their debt

at par.  Their maturities would be extended for three years, they would receive an additional 25

bps to raise their interest rate to Libor + 600 bps (which is 150 bps less than the new First Out

Term Loan), and the interest would take on a payment-in-kind feature at the Company's option.

Those Existing First Lien Lenders that did not consent to the proposal would become the "Third

Out Term Loan," receive no paydown or increase to the interest rate on their loans, and be

blocked from selling their loans even under an event of default, severely restricting their rights to

exit their investment.

34.     As a business matter, however, the economics for Silver Point and the Company

improved with every additional consent above 50% received by the Company.  Any incremental

increase in consents benefited the Company by reducing refinancing risk and improving the

maturity profile of the debt, because the "Second-Out Term Loan" debt was set to mature in 2023, as opposed to 2019 for the "Third-Out Term Loan" debt. Higher participation also benefited the Company by reducing its cash interest expense. For these reasons, the consent solicitation was structured to be highly coercive. Indeed, the Silver Point Defendants admitted in their internal emails that the transaction would "greatly enhance" their existing position in the structure, but only to the extent it could garner consents. For that reason, Silver Point admitted that it purposefully designed the death trap to be coercive and "quite punitive" for the Existing First Lien Lenders that declined to consent.

**B.     Debtor Defendants Provide the March Actuals to Silver Point and the Sponsors But Hide the March Actuals from Plaintiff and Other Existing First Lien Lenders**

35.     With the framework in place, consummation of the December Strategy was now finally within the Company's grasp. The last stage of execution was complicated, however, by the Company's closing of its books for March 2018 on April 20, 2018. The actual financial results for March 2018 fell dramatically short of the March Budget. Specifically, actual operational EBITDA for March was 31.6% less than projected.

36.     March is a critically important month for the Company's operations, given the uptick in revenue typically associated with the height of flu season in the United States. The shortfall reflected in the March Actuals was therefore a red flag that called into question the viability of the Company's capital structure and the credibility of the Debtor Defendants' budget. As the proverbial canary in the coal mine, the March Actuals were material at that time.

37.     For this reason, the Debtor Defendants promptly disclosed such numbers to the Silver Point Defendants and the Sponsors. On the Saturday morning immediately following the closing of the Company's books, David Smith (the Chief Financial Officer) emailed the March Actuals to the Silver Point Defendants, along with a thorough explanation of the discrepancies

from the March Budget.  Likewise, the Debtor Defendants provided the March Actuals and the accompanying explanation to the Sponsors prior to the ultimate closing of the April Transaction.

38.     The shortfall between the March Budget and the March Actuals presented the Defendants with a dilemma.  The information disclosure requirements in the Existing First Lien Credit Agreement and Second Lien Credit Agreement explicitly required that such information be disclosed to the Existing First Lien Lenders, including Plaintiff.  Specifically, the Second Lien Credit Agreement required that the Company disclose the March Actuals to Ares Capital Management ("Ares"), in its capacity as Second Lien Agent, on the 20th day following the close of March, i.e., by end of business on April 20th.  Second Lien Credit Agreement § 6.01(b).  The Existing First Lien Credit Agreement required that the Company "promptly" disclose to the administrative agent thereunder "copies" of whatever financial reporting it provided to Ares under the Second Lien Credit Agreement, or to any other holder of debt securities in excess of a "Threshold Amount" of $10 million, such as Silver Point.  Existing First Lien Credit Agreement § 6.02(c).

39.     At the same time, however, the Defendants recognized that disclosure of the March Actuals to Plaintiff and other Existing First Lien Lenders would imperil the Company's ability to obtain consents to the April 2018 Transaction.  And that risk was an existential one to the Company, as it had been informed by its auditor that it needed to close the April 2018 Transaction by April 30th or it would receive a negative audit opinion identifying not just going concern issues, but also operational and accounting issues, that would have constituted immediate incurable events of default under its various credit agreements.

40.     To comply with the Second Lien Credit Agreement, the Company emailed the March Actuals to Ares on Friday, April 20th.  The next morning, however—only four hours prior

to emailing Silver Point a lengthy explanation for the shortfall—the Debtor Defendants' Chief Financial Officer, David Smith, emailed Ares requesting that it disregard the March Actuals as premature and that it refrain from sharing the March Actuals with other lenders.

41.    The Company then elected to hide the March Actuals from Plaintiff and other Existing First Lien Lenders notwithstanding the requirements of the Existing First Lien Credit Agreement.    First, immediately following the disclosure to Ares, the Debtor Defendants scrambled to reach out to Citibank, the Former First Lien Agent, to verify that it had not in fact received the same distribution of the March Actuals.    The Debtor Defendants' financial advisor, PJT, requested that the Former First Lien Agent refrain from disclosing the March Actuals to Plaintiff and other Existing First Lien Lenders, to the extent it had received them (which it had not).

42.    Second, before the Company started soliciting lender consents, the Former First Lien Agent requested that the Debtor Defendants comply with section 6.02(c) of the Existing First Lien Credit Agreement and provide it with the same information that it provided to Ares on April 20th.  Specifically, that provision required the Company to produce "promptly after the furnishing thereof, copies of any material statements or material reports furnished to any holder of any class or series of debt securities of any Loan Party having an aggregate outstanding principal amount greater than the Threshold Amount or pursuant to the terms of the Second Lien Credit Documents . . .  in each case, so long as the aggregate outstanding principal amount thereunder is greater than the Threshold Amount and not otherwise required to be furnished to the Administrative Agent pursuant to any other clause of this Section 6.02."  As the Former First Lien Agent noted, this provision would have been triggered by the Company's sharing of the March Actuals with Ares on April 20th.  Moreover, this provision had also been triggered when

the Company shared the March Actuals with the Silver Point Defendants on April 21st.  Plaintiff

emailed Citibank on April 23rd (the day before the consent solicitation on the April 2018

Transaction had commenced) to inquire whether Citibank had received the March Actuals, and

Citibank responded on April 24th that it had not.

43.    The Debtor Defendants waited three days to respond and then, one day before the

closing of the solicitation window, provided Citibank with the March Budget, not the March

Actuals.

44.    That representation was affirmatively false.  In fact, the Debtor Defendants had

provided Ares with the March Actuals on April 20th, not the March Budget.  Furthermore, the

Debtor Defendants had provided Silver Point, a lender holding Existing First Lien Debt in excess

of the "Threshold Amount" specified in the Existing First Lien Credit Agreement, with the

March Actuals, along with an explanation thereof, on April 21st.  Each of these disclosures

triggered the Company's obligation to provide those same March Actuals to the Existing First

Lien Lenders, including Plaintiff, promptly thereafter.  And by providing the Former First Lien

Agent with the March Budget at a time when it knew that the March Actuals had materially

underperformed projections, the Debtor Defendants intentionally misled Plaintiff and other

Existing First Lien Lenders with respect to the financial status of the Company.  As such, the

consents for the April 2018 Transaction were procured by the Debtor Defendants with an intent

to actually delay, hinder, and defraud the recoveries of Plaintiff and other Existing First Lien

Lenders.

45.    The false representations of the Debtor Defendants ensured that Plaintiff and

other Existing First Lien Lenders were in the dark for the duration of the three day consent

solicitation.    The Debtor Defendants' lender call to "discuss" the proposal was brief and

perfunctory, with no opportunity for the lenders to ask questions.  The lenders were told they had

less than 72 hours—until 5:00 p.m. Eastern on April 27, 2018—to consent or be cast into the

"Third Out Term Loan" category.   One day before the expiration of the deadline, the lenders

received the March Budget (but not the March Actuals), which suggested a possibility that the

April 2018 Transaction could succeed in creating a sustainable capital structure for the

Company.

46.     The asymmetry of information was further compounded by Silver Point's

leadership in getting the transaction across the finish line.  At the time of launch, the Company

and its advisors presented its approval as a *fait accompli*, explaining that they "already had 49%

of the Existing First Lien Lenders on board."  That statement was false.   Ultimately, one day

before the expiration of the consent window, the Silver Point Defendants purchased additional

Existing First Lien Debt with the explicit stated purpose of ensuring that the transaction

surpassed the necessary consent threshold.  Silver Point acquired those additional loans from the

market at a time when it had insider knowledge of the March Actuals and the related shortfall

from the March Budget.  Indeed, the Silver Point Defendants knew that the Debtor Defendants

were providing incomplete and inaccurate information to Plaintiff and other Existing First Lien

Lenders, yet nevertheless proceeded with their efforts to secure consents from Plaintiff and other

Existing First Lien Lenders by any means possible.

47.     Ultimately, with knowledge of only the March Budget and not the March Actuals,

Plaintiff and other Existing First Lien Lenders provided consents to the April 2018 Transaction.

With the Silver Point Defendants calling the shots throughout the entirety of the process, the

April 2018 Transaction finally closed on April 27, 2018.

**FIRST CAUSE OF ACTION**
**(Fraudulent Inducement and Damages against the Debtor Defendants, Silver Point
Defendants and D&O Defendants)**

48.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs as if fully set forth herein.

49.    The Debtor Defendants, Silver Point Defendants and D&O Defendants fraudulently induced Plaintiff and other Existing First Lien Lenders to enter into the April 2018 Transaction, which included signing the Intercreditor Agreement.

50.    The Debtor Defendants, Silver Point Defendants and D&O Defendants had actual knowledge that the April 2018 Transaction required the consent of Existing First Lien Lenders holding a majority in amount of Existing First Lien Debt.

51.    The Debtor Defendants intentionally made material misrepresentations and omissions.  Specifically:

- The Debtor Defendants intentionally withheld the March Actuals from Plaintiff and other Existing First Lien Lenders, which constituted a material omission, with the intent to deceive Plaintiff and other Existing First Lien Lenders into believing that the Company was in better financial condition than it was and was more likely to avoid a chapter 11 filing than it was.

- The Debtor Defendants presented Plaintiff and other Existing First Lien Lenders with the March Budget, which in conjunction with their withholding of the March Actuals constituted a material misrepresentation regarding the Company's financial health, with the intent to deceive Plaintiff and other Existing First Lien Lenders into believing that the Company was in better financial condition than it was and was more likely to avoid a chapter 11 filing than it was.

52.    The Silver Point Defendants and D&O Defendants knew of the Debtor Defendants' misrepresentations and omissions, because, among other things, the Debtor Defendants presented the Silver Point Defendants with the March Actuals, along with an explanation of how those numbers deviated from the March Budget, mere hours after informing Ares, in its capacity as Second Lien Agent, that those same March Actuals were "premature." The Debtor Defendants also presented the March Actuals to the D&O Defendants before the transaction closed, while still having only provided Plaintiff and other Existing First Lien Lenders with the March Budget.

53.    The Debtor Defendants, Silver Point Defendants and D&O Defendants knew that the March Budget was a false indication of the Company's financial health at the time the March Budget was provided to Plaintiff and other Existing First Lien Lenders, as the Company had already prepared its actual financials for March 2018 and shared those numbers with the Silver Point Defendants and D&O Defendants.  At the time the Company provided Plaintiff and other Existing First Lien Lenders with the March Budget, the Debtor Defendants, Silver Point Defendants and D&O Defendants knew that material financial data points were false, including the operational EBITDA reported in the March Actuals being nearly 31.6% below the amount that was contained in the March Budget.

54.    The Debtor Defendants, Silver Point Defendants and D&O Defendants knew that the information contained in the March Actuals was not available to Plaintiff and other Existing First Lien Lenders, and that Plaintiff and other Existing First Lien Lenders would not be able to discover the information contained in the March Actuals through the exercise of ordinary care. The Debtor Defendants, Silver Point Defendants and D&O Defendants further knew that

Plaintiff and other Existing First Lien Lenders were consenting to the April 2018 Transaction

based on a reasonable, mistaken belief as to the Company's financial health.

55.     The Debtor Defendants, Silver Point Defendants and D&O Defendants intended

their misrepresentations and omissions to induce Plaintiff and other Existing First Lien Lenders

to consent to the April 2018 Transaction and sign the Intercreditor Agreement.   The fraud was

designed to allow the April 2018 Transaction to occur knowing that the April 2018 Transaction

would harm Plaintiff and other Existing First Lien Lenders.

56.     The Silver Point Defendants intentionally made omissions of material facts.

Specifically, the Silver Point Defendants, with actual knowledge of the Debtor Defendants'

misrepresentations and omissions, and with actual knowledge that the Silver Point Defendants

possessed material information that had been withheld from Plaintiff and other Existing First

Lien Lenders, actively worked to secure their consents without disclosing information about the

March Actuals, and to close the transaction by purchasing additional debt from Existing First

Lien Lenders.  The Silver Point Defendants intended their omissions to induce Plaintiff and other

Existing First Lien Lenders to consent to the April 2018 Transaction and sign the Intercreditor

Agreement.

57.     The D&O Defendants intentionally made omissions of material facts.

Specifically, the D&O Defendants, with actual knowledge of the Debtor Defendants'

misrepresentations and omissions, and with actual knowledge that the D&O Defendants

possessed material information that had been withheld from Plaintiff and other Existing First

Lien Lenders, approved the April 2018 Transaction, including the signing of the Intercreditor

Agreement.   The D&O Defendants intended their omissions to induce Plaintiff and other

Existing First Lien Lenders to consent to the April 2018 Transaction and sign the Intercreditor Agreement.

58.    Plaintiff and other Existing First Lien Lenders reasonably relied on the Defendants' misrepresentations and omissions in deciding whether to consent to the April 2018 Transaction and enter into the Intercreditor Agreement.  Had Plaintiff and other Existing First Lien Lenders seen the March Actuals, they would not have entered into the April 2018 Transaction or signed the Intercreditor Agreement.

59.    As a direct and proximate result of the Defendants' misrepresentations and omissions, Plaintiff has been damaged and is entitled to recover compensatory damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Aiding and Abetting Fraud against the Silver Point Defendants and D&O Defendants)**

60.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs, as though fully set forth at length herein.

61.    The Debtor Defendants fraudulently induced Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction, which included signing the Intercreditor Agreement, by intentionally misrepresenting and omitting material financial data, with the intent to deceive Plaintiff and other Existing First Lien Lenders into into believing that the Company was in better financial condition than it was and was more likely to avoid a chapter 11 filing than it was.

62.    The Defendants intended their misrepresentations and omissions to induce Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction and sign the Intercreditor Agreement.  The fraud was designed to allow the April 2018 Transaction to

occur knowing that the April 2018 Transaction would harm Plaintiff and other Existing First Lien Lenders.

63.     The Silver Point Defendants and D&O Defendants had actual knowledge of the Debtor Defendants' scheme to induce Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction by misrepresenting and omitting material financial data. The Silver Point Defendants and D&O Defendants further had actual knowledge that the March Budget provided to Plaintiff and other Existing First Lien Lenders contained material misrepresentations as the Silver Point Defendants and D&O Defendants had seen and analyzed both the March Actuals and the March Budget prior to the time of closing the April 2018 Transaction.

64.     The Silver Point Defendants knowingly provided the Debtor Defendants substantial assistance in achieving their fraudulent scheme by taking the lead on negotiating and structuring the April 2018 Transaction and Intercreditor Agreement while concealing the true facts about the Debtors' financial health from Plaintiff and other Existing First Lien Lenders, as such fraudulent scheme directly favored Silver Point at great cost to Plaintiff and other Existing First Lien Lenders.

65.     The Silver Point Defendants purchased additional Existing First Lien Debt just two days before the close of the consent period to ensure that they would be able to close the April 2018 Transaction with the requisite majority consenting.  The Silver Point Defendants possessed insider information as to the financial health of the Company at the time they purchased the additional Existing First Lien Debt, and knew that Plaintiff and other Existing First Lien Lenders did not possess such information.

66.     The D&O Defendants knowingly provided the Debtor Defendants substantial assistance in achieving their fraudulent scheme by approving the April 2018 Transaction and

Intercreditor Agreement against the interest of Plaintiff and other Existing First Lien Lenders while concealing the true facts about the Debtors' financial health from Plaintiff and other Existing First Lien Lenders.

67.     Plaintiff and other Existing First Lien Lenders reasonably relied on the Debtor Defendants' misrepresentations and omissions and the Silver Point Defendants' and D&O Defendants' omissions in deciding whether to consent to the April 2018 Transaction and enter into the Intercreditor Agreement, and suffered damages as a result.

68.     As a direct and proximate result of the Silver Point Defendants' and D&O Defendants' actions, Plaintiff has been damaged and is entitled to recover compensatory damages in an amount to be determined at trial.  The injury to Plaintiff was a foreseeable result of the Silver Point Defendants' and the D&O Defendants' actions.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment Setting Aside the Intercreditor Agreement)**

69.     Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs as if fully set forth herein.

70.     An actual controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201, related to the validity and enforceability of the Intercreditor Agreement.  Specifically, the parties dispute whether the Intercreditor Agreement is invalid in light of the consents to the April 2018 Transaction having been fraudulently induced.

71.     The Debtor Defendants, Silver Point Defendants and D&O Defendants had actual knowledge that the April 2018 Transaction required the consent of Existing First Lien Lenders holding a majority in amount of debt under the Existing First Lien Credit Agreement.

72.     The Debtor Defendants intentionally made material representations and omissions.  Specifically,

- The Debtor Defendants withheld the March Actuals from Plaintiff and other Existing First Lien Lenders, which constituted a material omission, with the intent to deceive Plaintiff and other Existing First Lien Lenders into believing that the Company was in better financial condition than it was and was more likely to avoid a chapter 11 filing than it was.

- The Debtor Defendants presented Plaintiff and other Existing First Lien Lenders with the March Budget, which in conjunction with their withholding of the March Actuals constituted a material misrepresentation regarding the Company's financial health, with the intent to deceive Plaintiff and other Existing First Lien Lenders into believing that the Company was in better financial condition than it was and was more likely to avoid a chapter 11 filing than it was.

73.     The Silver Point Defendants and the D&O Defendants knew of the Debtor Defendants' misrepresentations and omissions, because the Debtor Defendants presented the Silver Point Defendants with the March Actuals, along with an explanation of how those numbers deviated from the March Budget, mere hours after informing Ares, in its capacity as Second Lien Agent, that those same March Actuals were "premature." The Debtor Defendants also presented the March Actuals to the D&O Defendants before the transaction closed and while still having only provided Plaintiff and other Existing First Lien Lenders with the March Budget.

74.     The Defendants knew that the March Budget was a false indication of the Company's financial health at the time the March Budget was provided to Plaintiff and other Existing First Lien Lenders, as the Company had already prepared its actual financials for March 2018. At the time the Company provided Plaintiff and other Existing First Lien Lenders with the March Budget, the Debtor Defendants, Silver Point Defendants and D&O Defendants knew that

material financial data points were false, including the operational EBITDA reported in the March Actuals being nearly 31.6% below the March Budget.

75.    The Defendants knew that the information contained in the March Actuals was not available to Plaintiff and other Existing First Lien Lenders and that they would not be able to discover the information contained in the March Actuals through the exercise of ordinary care. The Defendants further knew that Plaintiff and other Existing First Lien Lenders were consenting to the April 2018 Transaction based on a reasonable, mistaken belief as to the Company's financial health.

76.    The Defendants intended their misrepresentations and omissions to induce Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction and sign the Intercreditor Agreement.    The fraud was designed to allow the April 2018 Transaction to occur knowing that the April 2018 Transaction would harm Plaintiff and other Existing First Lien Lenders.

77.    The Silver Point Defendants intentionally made omissions of material facts. Specifically, the Silver Point Defendants, with actual knowledge of the Debtor Defendants' misrepresentations and omissions, and with actual knowledge that the Silver Point Defendants possessed material information that had been withheld from Plaintiff and other Existing First Lien Lenders, actively worked to secure their consents without disclosing information about the March Actuals, and to close the transaction by purchasing additional debt from Existing First Lien Lenders.  The Silver Point Defendants intended their omissions to induce Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction and sign the Intercreditor Agreement.

78.     The D&O Defendants intentionally made omissions of material facts. Specifically, the D&O Defendants, with actual knowledge of the Debtor Defendants' misrepresentations and omissions, and with actual knowledge that the D&O Defendants possessed material information that had been withheld from Plaintiff and other Existing First Lien Lenders, approved the April 2018 Transaction, including the signing of the Intercreditor Agreement. The D&O Defendants intended their omissions to induce Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction and sign the Intercreditor Agreement.

79.     Plaintiff and other Existing First Lien Lenders reasonably relied on the Defendants' misrepresentations and omissions in deciding whether to consent to the April 2018 Transaction and enter into the Intercreditor Agreement. Had Plaintiff and other Existing First Lien Lenders seen the March Actuals, they would have neither entered into the April 2018 Transaction nor signed the Intercreditor Agreement.

80.     Due to the Debtor Defendants' and Silver Point Defendants' fraudulent inducement, the Intercreditor Agreement should be declared invalid and unenforceable.

## FOURTH CAUSE OF ACTION
### (Equitable Subordination against the Silver Point Defendants)

81.     Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs as if fully set forth herein.

82.     Pursuant to section 510(c) of the Bankruptcy Code, the Court may subordinate all or part of an allowed claim to all or part of another allowed claim when inequitable conduct has resulted in an injury to creditors or provided an unfair advantage to the claimant, so long as subordination is not inconsistent with the Bankruptcy Code. The equities under the

circumstances dictate that the claims of the Silver Point Defendants be equitably subordinated to the claims of Plaintiff.

83.    As alleged above, the Silver Point Defendants participated in and benefitted from inequitable conduct, including, but not limited to, the purchase of debt with insider information.

84.    At a minimum, the Silver Point Defendants had actual knowledge of the Debtor Defendants' scheme to induce Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction by misrepresenting and omitting material financial data.   The Silver Point Defendants also had actual knowledge that the March Budget provided to Plaintiff and other Existing First Lien Lenders contained material misrepresentations, as the Silver Point Defendants had seen and analyzed both the March Actuals and the March Budget prior to the time of closing the April 2018 Transaction.

85.    The Silver Point Defendants had actual knowledge that the April 2018 Transaction required the consent of Existing First Lien Lenders holding a majority in amount of debt under the Existing First Lien Credit Agreement, and knew that if Plaintiff and other Existing First Lien Lenders had access to the March Actuals, the consent process would be adversely impacted.

86.    The Silver Point Defendants, with actual knowledge of the Debtor Defendants' misrepresentations and omissions, and while possessing material information that they knew had been withheld from Plaintiff and other Existing First Lien Lenders, actively worked to secure consents from Plaintiff and other Existing First Lien Lenders, and to close the transaction by purchasing additional debt from Existing First Lien Lenders.

87.    The Silver Point Defendants actively participated in a scheme that misrepresented the truth to Plaintiff and other Existing First Lien Lenders about the investment Plaintiff and

other Existing First Lien Lenders were making and coerced their participation in such a doomed investment.

88.    As a result, Silver Point received an unfair advantage as a claimant in these Chapter 11 Cases. The Silver Point Defendants' collateral position substantially improved while Plaintiff and other Existing First Lien Lenders were damaged.

89.    Plaintiff has suffered a particularized harm as a result of the inequitable conduct. Before the April 2018 Transaction, the Existing First Lien Debt was first in priority and fully secured, but now, as a result of the transaction, according to the Debtors' valuation, Plaintiff and other Existing First Lien Lenders are entirely out of the money. They are also subordinated to Silver Point in payment and lien priority through the Intercreditor Agreement. This harm has particularly affected Plaintiff as an Existing First Lien Lender and the same harm did not occur to all creditors generally.

90.    The Silver Point Defendants' inequitable conduct was committed to benefit Silver Point and directly subordinate Plaintiff's and other Existing First Lien Lenders' rights to those of the Silver Point Defendants.

91.    Allowing the Silver Point Defendants to receive payment on their claims prior to Plaintiff's claims would be unfair and inequitable.

92.    Because the Silver Point Defendants exerted excessive influence over the Debtors and had access to inside information, the Court should apply special scrutiny to the Silver Point Defendants' conduct.

93.    Equitable subordination of Silver Point's claims would not be inconsistent with the Bankruptcy Code.

94.    Accordingly, the Silver Point Defendants' claims should be equitably subordinated to Plaintiff's claims pursuant to section 510(c) of the Bankruptcy Code.

## FIFTH CAUSE OF ACTION
### (Avoidance of the April 2018 Transaction as an Actual Fraudulent Transfer)

95.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs as if fully set forth herein.

96.    The Debtor Defendants incurred obligations pursuant to the priority first lien credit agreement dated April 30, 2018 (the "Priority First Lien Credit Agreement"), which was entered into in connection with the April 2018 Transaction, within two years prior to the Petition Date.  Specifically, the April 2018 Transaction required the Debtor Defendants to incur $160 million of new debt, in addition to a $56 million roll-up Silver Point's Existing First Lien Debt.

97.    Prior to the announcement of the April 2018 Transaction, the Debtors Defendants did not communicate with Plaintiff regarding the April 2018 Transaction, despite receiving inquiries from Plaintiff and other Existing First Lien Lenders.  Rather, the Debtor Defendants exclusively communicated with the Silver Point Defendants regarding the April 2018 Transaction.

98.    Prior to the announcement of the April 2018 Transaction, the Debtor Defendants did not disclose to Plaintiff that they were negotiating a re-financing with the Silver Point Defendants.  The Debtor Defendants also withheld material financial information that they were sharing with the Silver Point Defendants from Plaintiff and other Existing First Lien Lenders.

99.    Among other things, one week before the April 2018 Transaction, the Debtor Defendants provided the March Actuals to the Silver Point Defendants, while withholding the March Actuals from Plaintiff and other Existing First Lien Lenders.  Additionally, the Debtor Defendants provided the March Budget to the Former First Lien Agent in lieu of the March

Actuals, to which the Former First Lien Agent was entitled, and which the Former First Lien Agent had requested.  The Debtor Defendants knew that the March Budget contained false and misleading information regarding the Debtors' financial health.  The Debtor Defendants provided the March Actuals to Ares, as required under the Second Lien Agreement, but quickly told Ares that the numbers were "premature" and instructed Ares to disregard the March Actuals and not share them with other lenders.  Meanwhile, the Debtor Defendants were discussing the March Actuals with the Silver Point Defendants.

100.    Prior to the announcement of the April 2018 Transaction, the Debtor Defendants did not disclose the terms of their re-financing with the Silver Point Defendants to Plaintiff or other Existing First Lien Lenders, or seek better re-financing terms from the Existing First Lien Lenders.

101.    The consent solicitation for the April 2018 Transaction commenced on April 24, 2018, with the requirement that the transaction be approved by April 27, 2018, a mere three days later.  The Debtor Defendants coerced Plaintiff and other Existing First Lien Lenders into approving the April 2018 Transaction by providing them with limited notice and information and threatening to subordinate them if they did not approve it.

102.    The liens and roll-up of $56 million granted in connection with the Priority First Lien Credit Agreement were given for illusory and/or insufficient consideration, as the Silver Point Defendants were able to roll up their Existing First Lien Debt into priority debt on better economic terms, and were granted a super-priority position over Plaintiff and other Existing First Lien Lenders with whom they once ranked *pari passu*, thus effectively rendering the Priority First Lien Credit Agreement risk-free.

103.    The consideration given by the Silver Point Defendants in connection with the April 2018 Transaction was also illusory and/or insufficient because the Debtor Parties did not determine, and in fact avoided seeking to determine, whether they could receive better consideration from any of the Existing First Lien Lenders in exchange for similar terms.

104.    The Debtor Defendants entered into the April 2018 Transaction and granted the first priority liens and roll-up of $56 million in connection with the Priority First Lien Credit Agreement with actual intent to hinder, delay, or defraud present or future creditors of the Debtors.

105.    As a direct and proximate result of grant of the liens and $56-million roll-up in connection with the Priority First Lien Credit Agreement, the Debtors and their respective creditors suffered losses amounting to at least the amount of the value of the interests conveyed thereunder.

106.    The Debtor Defendants filed the Chapter 11 Petitions ten months after the closing of the April 2018 Transaction.

107.    Based upon the foregoing, the liens and $56 million roll-up granted in connection with the Prepetition First Lien Security Amendments constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the liens and $56 million roll-up should be avoided, and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duties against the D&O Defendants)

108.    Plaintiff repeats and re-alleges the allegations contained above in all prior paragraphs as if fully set forth herein.

109.    The D&O Defendants have fiduciary duties of due care to act in the best interests of the estate, which preclude them from acting to further their self-interest to the prejudice of the Debtors or other creditors, including Plaintiff and other Existing First Lien Lenders.

110.    The D&O Defendants knowingly breached their fiduciary duties by approving the April 2018 Transaction against the interests of the Company, Plaintiff and other Existing First Lien Lenders.

111.    The Debtor Defendants presented Plaintiff and other Existing First Lien Lenders with the March Budget containing material misrepresentations regarding the Company's financial health with the intent to deceive them into believing that the Company was in better financial condition than it was and was more likely to avoid a chapter 11 filing than it was.

112.    The D&O Defendants intentionally withheld the March Actuals from Plaintiff and other Existing First Lien Lenders, which constituted a material omission with respect to the Company's financial health, with the intent to deceive Plaintiff and other Existing First Lien Lenders into believing that Trident was in better financial condition than it was and was more likely to avoid a chapter 11 filing than it was.

113.    The D&O Defendants knew that the March Budget was a false indication of the Company's financial health at the time the March Budget was provided to Plaintiff and other Existing First Lien Lenders, as the Company had already prepared its actual financials for March 2018.  At the time the Company provided Plaintiff and other Existing First Lien Lenders with the March Budget, the D&O Defendants knew that material financial data points were false, including the operational EBITDA reported in the March Actuals being nearly 31.6% below the March Budget.

31

114.    The D&O Defendants intended their misrepresentations and omissions to induce Plaintiff and other Existing First Lien Lenders to consent to the April 2018 Transaction and sign the Intercreditor Agreement.  The fraud was designed to allow the April 2018 Transaction to occur knowing that the April 2018 Transaction would not only harm Plaintiff and other Existing First Lien Lenders but the Company as a whole, because the April 2018 Transaction was pursued to the exclusion of other viable restructuring options, and the Company thereby took on extra debt that caused it to become unsustainably over-leveraged.

115.    As a direct and proximate result of these breaches of fiduciary duty, the Debtors suffered losses amounting to at least the amount of the value of the interests conveyed by grant of the liens and the $56-million roll-up in connection with the Priority First Lien Credit Agreements.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff requests that judgment be entered in their favor against the Defendants as follows:

A.    Holding that the Debtor Defendants, Silver Point Defendants, and the D&O Defendants fraudulently induced Plaintiff and other Existing First Lien Lenders to enter into the April 2018 Transaction, including signing the Intercreditor Agreement.

B.    Holding that the Silver Point Defendants and the D&O Defendants aided and abetted the Debtor Defendants to fraudulently induce Plaintiff and other Existing First Lien Lenders to enter into the April 2018 Transaction, including signing the Intercreditor Agreement.

C.    Declaring that the Intercreditor Agreement is invalid and unenforceable.

D.    Equitably subordinating the Silver Point Defendants' claims to the claims of Plaintiff pursuant to section 510(c) of the Bankruptcy Code.

E.      Holding that the liens and $56 million roll-up granted in connection with the April 2018 Transaction constitute avoidable fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy Code and, in accordance with section 550(a) of the Bankruptcy Code, the liens and $56 million roll-up should be avoided and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

F.      Holding that the D&O Defendants breached their fiduciary duties to the Company, Plaintiff and other Existing First Lien Lenders.

G.      Awarding Plaintiff damages in an amount to be determined at trial.

H.      Providing for such other relief as justice and equity may require.


DATED this 22nd day of May, 2019          Respectfully submitted,
      New York, New York

                                          By:  */s/ Harrison Denman*
                                          WHITE & CASE LLP
                                          Southeast Financial Center
                                          200 South Biscayne Blvd., Suite 4900
                                          Miami, Florida 33131
                                          Telephone: (305) 371-2700
                                          Thomas E Lauria (admitted *pro hac vice*)
                                          Erin R. Rosenberg (admitted *pro hac vice*)

                                          1221 Avenue of the Americas
                                          New York, New York 10020
                                          Telephone:  (212) 819-8200
                                          Facsimile:  (212) 354-8113
                                          Harrison Denman
                                          John Ramirez

                                          111 South Wacker Drive, Suite 5100
                                          Chicago, Illinois 60606-5055
                                          Telephone: (312) 881-5400
                                          Jason N. Zakia (admitted *pro hac vice*)

                                          *Counsel for Capital Finance Opportunities
                                          1701C, LLC*


33